# EXHIBIT A

Filed 9/11/20

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D075325 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD255517) |
| CLARENCE ROLAND, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Albert T. Harutunian III, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers, Adrianne S. Denault and Sharon L. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

During the mortgage crisis following the 2008 recession, Clarence Roland devised a mortgage fraud scheme in which he convinced distressed

homeowners they could avoid foreclosure if they paid him a substantial fee and transferred title in their homes to companies he controlled.  He subsequently sold the homes to unwitting purchasers, pocketing most of the proceeds.  To accomplish this, he caused various fraudulent documents to be signed and recorded, which had the effect of clouding title and stalling the foreclosure process.  Several of Roland's victims, both the homeowners and purchasers, were later sued by the legitimate lienholders for fraud.  A jury convicted Roland of four counts of grand theft of personal property (Pen. Code, § 487, subd. (a); counts 17, 18, 26, and 27) and 14 counts of filing a false instrument (*id.*, § 115, subd. (a); counts 16, 19-25, 28-33).[1]

Roland raises four issues on appeal, contending:  (1) insufficient evidence supports the grand theft convictions because a rational trier of fact could not have found beyond a reasonable doubt he had the specific intent to defraud the homeowners or purchasers; (2) the trial court erroneously admitted evidence of uncharged acts (Evid. Code, §§ 1101, subd. (b), 352); (3) the trial court erroneously admitted evidence of Roland's prior civil settlement with Mortgage Electronic Registration Systems, Inc. (MERS); and (4) the trial court erroneously imposed a two-year enhancement under Penal Code section 12022.6, which was repealed after the commission of Roland's offenses.  We reject Roland's contentions.  The Attorney General contends remand for resentencing is warranted because the trial court's failure to impose a mandatory fine under Penal Code section 186.11, subdivision (c) amounts to an unauthorized sentence.  Roland concedes this point.  We agree that remand is warranted to allow the trial court to impose the fine.  In all other respects, we affirm the judgment.

---

[1]     Unless otherwise specified, statutory references are to the Penal Code.

FACTS

*Indictment*

In 2015, a grand jury indicted Roland on 74 counts of theft (§ 487, subd. (a)), forgery (§ 470, subd. (d)), and related crimes.  In 2017, the indictment was amended to assert 33 counts comprised of five counts of grand theft of personal property (§ 487, subd. (a); counts 1, 17, 18, 26, 27) and 28 counts of filing a false instrument (§ 115, subd. (a); counts 2-16, 19-25, 28-33).[2]  The amended indictment further alleged that Roland committed two or more related felonies, a material element of which was fraud and embezzlement, which involved a pattern of related felony conduct and which involved the taking and resulted in the loss by another person of more than $500,000 (§ 186.11, subd. (a)(2)), and that in the commission of the offenses, the aggregate losses to the victims from all the charges arose from a common scheme and exceeded $200,000 (§ 12022.6, subds. (a)(2), (b)).

The charges arose from real estate transactions involving three residential properties in San Diego County:  Bellevue Avenue (count 16); Caminito Barlovento (counts 17-25), and Crossroads Street (counts 26-33).

*Trial*

A. *Prosecution's Case*

1. *The Bellevue Avenue Property (Count 16)*

In 2006, Mike K. obtained a home loan and home equity line of credit in connection with the purchase of his family's home on Bellevue Avenue. Beginning in 2008 or 2009, financial distress caused Mike to fall behind on mortgage payments.  In September 2010, Mike received a notice of default and election to sell, and later, a notice of trustee's sale.

---

2        During trial, counts 1 through 15 were dismissed as barred by the applicable statute of limitations.  (§ 801.)

3

A friend introduced Mike to Roland.  Roland represented to Mike that he had "a process"—that was "pretty intense" and would require "a lot of paperwork"—for getting a modification of Mike's loan.  Roland said he had a legal team that would send Mike paperwork, and Mike would have to get documents notarized and returned quickly.  Roland said they were "working against the clock," and when he sent Mike something, he needed it back "ASAP that day."  Roland also asked him to file certain documents with the county recorder's office.

Mike wired $15,000 to Roland to begin the process.  In total, Mike paid Roland about $30,000.

Mike did not understand most of the documents he signed and filed per Roland's instructions.  He relied on Roland's expertise.  Roland told him he would have to substitute in on the property so that he could obtain the loan modification, and afterwards he would "substitute it back."  Mike acknowledged this sounded "a bit crazy" at the time, but he was desperate to keep his family in the home, and felt he was "already so far down the road" with the process.  In 2012, Mike was evicted from the home in an unlawful detainer action.  Roland represented that he would continue working on the process and Mike and his family would be able to move back in, but they were never able to move back in.  Mike would not have worked with Roland if he knew the process included filing false documents.

Some of the documents recorded in connection with the Bellevue Avenue property included a substitution of trustee, which purported to substitute a company controlled by Roland in place of the original trustee; an assignment of deed of trust which assigned Mike's beneficial interest in the property to "Bellevue Avenue Trust" to transfer control from Mike to Roland; a substitution of trustee and full reconveyance which purportedly substituted

Roland's company in place of the trustee under the deed of trust; and a deed of full reconveyance purporting to represent that obligations under the first deed of trust had been satisfied. Each of these documents was signed by Natascha Bravo, purportedly authorized to sign on behalf of MERS, the beneficiary under the original deed of trust; however, no one by that name ever worked for or was authorized to sign on behalf of MERS. In addition, the "Bellevue Avenue Trust" was listed as having the same mailing address as Roland's company Restoreloution Trustee, in Las Vegas. Investigators for the San Diego District Attorney's Office could not find a business called Restoreloution at that address. The building at that location was a Regus office building at which Regus rented office space on a temporary basis and provided virtual offices, which did not require a physical presence, but offered a mailing address and receptionist. Similarly, Roland's company United National Title Company—which was listed on the deed of full reconveyance— listed an address for another Regus office suite. Regus was under contract with a company called United National Title Company in 2010 and 2011 for mail forwarding and telephone-answering services only; the signatories on the contract for United National Title Company were Roland and Arlando Jacobs. Some of the documents Roland directed to be prepared included incorrect loan numbers.

A corporation assignment of deed of trust was also recorded in connection with the property. This document was signed by Steve Dockery as the authorized agent for another of Roland's entities, Federal National Services, LLC. Also recorded was a deed of trust under which one of Roland's companies, InterBank Loan Servicing Corporation (InterBank), purported to be the lender. The investigator testified he was unable to verify that InterBank was a federally regulated lender or that it was a corporate entity

that actually existed; however, it listed the same address as Roland's company United National Title. An investigator with the real estate fraud unit of the San Diego District Attorney's Office concluded these documents were not valid.

Even after the original lender filed a rescission of full reconveyance and obtained title to the property through a trustee sale, Roland continued to record documents attempting to cloud title, including a rescission of trustee's deed, filed by Restoreloution and signed by Steve Dockery as Restoreloution's authorized agent; a corporation assignment of deed of trust; and a substitution of trustee purporting to substitute Roland's company Federal National Services as trustee under the deed of trust. The investigator concluded none of these documents was valid.

Donna G., who testified at trial, executed the substitution of trustee document as the "[a]uthorized [s]igner" for Roland's company Federal National Services. Donna testified she was hired to sign documents and have them notarized by Roland's business partner "Ray" Jacobs. She testified she was paid per signature, she was not affiliated with the various entities on whose behalf she signed, and she did not have any idea what she was signing. If she ever had an issue with a document she was to sign, she would contact either Jacobs or Roland.

Donna signed other documents purporting to transfer title to the Bellevue property. She executed a rescission of trustee's deed, a rescission of default and election to sell, and a deed of full reconveyance, as the "[a]uthorized [a]gent – FNSLLC" for "Southwest Security Passthrough LLC." She executed a substitution of trustee and full reconveyance as "[a]uthorized [a]gent" for purported trustee Federal National Services.

2. *The Caminito Barlovento Property (Counts 17-25)*

In 2003, Susan S. purchased a home on Caminito Barlovento; she "put all of [her] earnings" into significant renovations.  In 2006, she consolidated and refinanced her home loans; Wells Fargo was her lender.  Wells Fargo subsequently assigned the deed of trust to Bank of America but Wells Fargo remained the servicer on the loan.  Susan fell behind on her payments, and in 2010 received a notice a default from Wells Fargo.  A friend told Susan that Roland could help her.  Susan contacted Roland and his company "Truth in Lending Associates" or "TILA Corp."  She told Roland she wanted to stop the foreclosure and stay in her home.  Roland assured her he could prevent the foreclosure but she would have to sell the home.  He promised there would be proceeds from the sale and told her she would receive fifty percent of those proceeds.  She believed her home would be sold through legal means.

Roland told her his fee for the program was $25,000.  She agreed to pay the fee, however, she told him she did not have the money to pay up front and agreed the fees would be deducted when the home was sold.  After her initial contact with Roland, her main contact was through one of his assistants.  Roland sent her several documents for her to sign and mail to various places.  She did not understand the documents she signed; she was in a state of distress, and Roland offered her hope he could save her house from foreclosure.

To sell Susan's home, Roland arranged for numerous documents to be signed and recorded.  First, Connie Benino, as the purported authorized agent of Bank of America, signed and recorded a corporation assignment of deed of trust, which purportedly transferred Bank of America's beneficial interest in the first deed of trust to Southwest Wells Fargo 2006 Corporate Pass-through Certificates Series 2006 (Southwest Wells Fargo), a fictitious

entity whose name did not appear in the SEC database.  Connie Benino was not a Bank of America employee and was not authorized to sign documents on its behalf.  Benino's signature, which had appeared on numerous documents, was notarized by fictitious notary Ming Li.[3]  Further, Bank of America would not have signed or filed such a document; that responsibility would have been handled by Wells Fargo, the loan servicer.  Wells Fargo did not authorize the transfer of Bank of America's beneficial interest in the first deed of trust to Southwest Wells Fargo, or the filing of the assignment of the deed of trust.  Finally, a copy of the assignment of deed of trust was to be mailed to Southwest Wells Fargo at the same address listed for various other entities on other documents, including Roland's business Federal National Services.  The District Attorney investigator found the document "very suspicious."

Through a deed in lieu of foreclosure, Susan transferred her ownership interest in the property to Southwest Wells Fargo, as a purported successor to her original lender Wells Fargo.  Susan testified she was "unclear" as to why she needed to sign this document, but did so because Roland sent it to her and directed her to sign it and file it with the county recorder's office. Angie Garcia signed on behalf of Southwest Wells Fargo, purportedly as its

---

[3]     Notary stamps in the names of "F. Vasquez" and "Ming Li" were found in Roland's home during execution of a search warrant.  Such stamps are supposed to remain in the possession of the notary at all times.  Roland testified that he "acquire[d]" these stamps when the notaries "signed an authorization to a gentleman" whose name he could not remember, who then gave Roland and his company (Restoreloution) permission to use them. Notary applications by F. Vasquez and Ming Li were submitted on May 28 and May 30, 2012; the address listed on Li's application is currently an adult entertainment business.  During the same search, an ink stamp with the name "Angie Garcia" was also recovered.

authorized agent.  Garcia's signatures were notarized by fictitious notary F. Vasquez.[4]  Garcia signed other documents as an authorized agent for other entities controlled by Roland, including Federal National Services.  Wells Fargo did not authorize Garcia to sign this or other documents on its behalf and did not authorize the execution or recording of the document.  The District Attorney investigator found the document "very suspicious."

Southwest Wells Fargo, by authorized signer Angie Garcia, subsequently filed a grant, bargain, and sale deed, purporting to sell the property to Roland's company, Ananias & Sapphira Investors Group (Ananias & Sapphira) for $685,000.  On this document, Garcia's signature was notarized by fictitious notary Ming Li.  Wells Fargo did not authorize this document or the transfer of the property to Ananias & Sapphira.  At the same time, Roland's company InterBank recorded a deed of trust stating it had a security interest in the property based on a $445,250 loan to Ananias & Sapphira to purchase the property.  Joshua Stein, a name Roland acknowledged he used to sign documents, signed the deed of trust on behalf of Ananias & Sapphira.  The signature was notarized by fictitious notary Ming Li.  Wells Fargo did not authorize the deed of trust.  At the time, Susan was not aware of the transfer or purported loan.  The District Attorney investigator believed the documents were invalid and filed to cloud title to the property.

Roland's company Federal National Services, through signatory Angie Garcia, recorded a full reconveyance purporting to report that Wells Fargo had been paid in full.  Garcia's signature was notarized by the fictious notary Ming Li.  However, Wells Fargo had sold the loan to Bank of America and

---

[4]     See footnote 3, *ante*.

was no longer the lender on the property.  A recorded copy of the full reconveyance was to be mailed to United National Title at the same address used by Southwest Wells Fargo and Federal National Services.  That same day, Federal National Services recorded a substitution of trustee and full reconveyance which purportedly substituted Federal National Services as a trustee under a deed of trust that had been extinguished in 2006 when Susan consolidated and refinanced her home loans.  The document was signed by Roland's signatories Connie Benino, as purported agent for Wells Fargo, and Angie Garcia, as agent for Federal National Services.  The signatures were notarized by the fictious notary Ming Li.

Roland told Susan the property had been sold and she had to move out. Susan subsequently received proceeds from the sale of over $100,000.  Susan understood that Roland had charged her about $25,000 for his services, which he deducted from her share of the sale proceeds.

Approximately six months later, Susan was sued by Bank of America and the new homeowner.  Susan was shocked and stressed by the lawsuit. She tried to handle the litigation herself, but ultimately had to hire an attorney and incurred legal fees.  To settle the lawsuit, Susan did not have to return any money that she received; she only had to sign away any right to the property (which she believed she had already done).  Her credit report reflected a foreclosure.

Jamel D. of A & D Enterprises Unlimited, LLC (A & D Enterprises) buys distressed real estate, renovates it, and sells it for profit.  Through marketing and networking, Jamel frequently receives leads on properties for sale.  Caminito Barlovento "came across [his] desk," and it appeared to be a good investment opportunity because it was listed for sale below market value.  The seller wanted a cash offer.  Jamel and his business partners

decided to buy the property.  In December 2013, A & D Enterprises purchased the property from Ananias & Sapphira for $625,000.[5]  Roland's company Ananias & Sapphira received just over $110,000 in the sale, and his company InterBank received $474,000.  The transaction was not authorized by Wells Fargo.  Bank of America subsequently named A & D Enterprises in a lawsuit.  When Jamel was served with the lawsuit, he "didn't know what to think."  He was stressed and lost time as a result of the lawsuit, which was a hardship, and his business partner had to hire an attorney to help resolve the lawsuit.

At trial, an authorized representative from Wells Fargo Bank, NA, reviewed the recorded documents that purported to pass Caminito Barlovento from Susan to Southwest Wells Fargo, to Ananias & Sapphira, and finally to A & D Enterprises, and purporting to reflect Ananias & Sapphira's loan of $445,000 on the property.  The Wells Fargo representative testified that Wells Fargo did not authorize any of these documents or transactions.

3. *The Crossroads Street Property (Counts 26-33)*

Angela and Arnel R. purchased their home at Crossroads Street in or around 2006.  In 2007, after Arnel retired from the Navy, they borrowed additional money against the home to help finance the opening of a restaurant.  The restaurant failed, and they began to fall behind on their mortgage payments.  In 2012, they worked with Lu Jones attempting to short sell the home, but the bank would not approve it.  In 2013, they received a notice of trustee sale informing them the home would be sold at auction.

---

[5]     Jamel testified that he used a "hard money loan" to quickly obtain the funds to purchase the property in cash.  He subsequently sold the property to his business partner who wanted to own the property as his personal residence but desired to finance such a purchase through a conventional loan.

Jones introduced Angela and Arnel to Susan S. who described a company, TILA Corporation, that was helping homeowners. Angela reviewed the website and saw Roland, who appeared to be very religious and professional and spoke about helping homeowners with problem loans. Jones set up a conference call between Angela, Arnel, and Roland. Roland told them he would have to review their mortgage documents to see if they qualified. Roland said the process "really helps the homeowners because [Roland was] going to fight the bank," and that, "in the end, the homeowners get a settlement." He explained that the process was expensive because it was long and there were a lot of people involved. Angela and Arnel told Roland they could not afford the program, so Roland arranged an installment payment system for them.

Lu Jones emailed Angela a contract and fee schedules. Angela understood Roland had to review the paperwork associated with her home loan to see if they qualified for the program. After Angela and Arnel were told they qualified for the program, they made an initial payment of $10,500, payable to Roland's company Restoreloution. In all, they paid $23,500.

Angela and Arnel were told there were four phases to the program. They were required to wire additional payments at each phase. During each phase, they would receive papers to notarize and file. On the morning of the scheduled home auction, they signed, notarized, and filed at the county recorder's office a one-page document. After recording that document, they did not receive any additional auction notifications and were hopeful about the process.

Angela and Arnel did not understand the documents Roland had them sign, but they participated in the process because they relied on his expertise

and trusted that his process would stop the foreclosure sale.  They believed Roland's company was legitimate.

Eventually Lu Jones told them their home had been sold to investors. Jones arranged for them to receive a wire payment of $168,000, which they understood to be their portion of "the settlement" with the bank.  They moved to another home nearby so their children could stay in the same schools. They referred friends to the program, which they thought was helping homeowners.

Much later, Angela and Arnel were named as parties in lawsuits filed by the entity that purchased the home and by the bank.  They had to retain a lawyer at an expense of roughly $5,000.  They were ultimately able to settle the lawsuits by attesting they had no interest in the home.  Angela was "so stressed" by the whole ordeal.  She felt she damaged her reputation in the community as a nurse and her husband's reputation as a military veteran. She felt "really, really guilty" for going through with the process, which they thought was "a real thing," for referring friends, and for exposing her children to the stress.  Arnel, a Navy retiree honorably discharged after decades of service, felt he lost his honor, credibility, and integrity in the incident, and still fears repercussions.

Much like the transactions recorded in connection with the Caminito Barlovento property, Roland orchestrated the filing and recording of a series of invalid and unauthorized documents that purported to affect the transfer of the Crossroads Street property to his company Ananias & Sapphira. Connie Benino and Angie Garcia were unauthorized signatories on invalid documents notarized by the fictitious notary Ming Li.  The collective effect of the documents was to cloud title on the property, which prevented the lender

13

from foreclosing, and to purportedly transfer the property from the homeowners to Roland's company, and ultimately to an innocent buyer.

Lu Jones told a real estate agent she knew about an investor-owned property for sale. The property was listed at an all-cash price of $455,000, but the real estate agent's market analysis indicated the market value to be "in the mid-500 range." The agent referred the lead to his brother, who, along with his father, had a family-owned real estate investment company, A Pacific Holdings LLC.

Roland's company Ananias & Sapphira sold the Crossroads Street property to A Pacific Holdings in an all-cash transaction for $455,000. Ananias & Sapphira received net sale proceeds of over $420,000. A Pacific Holdings made some renovations to the property and rented it out as an investment property. About ten months after A Pacific Holdings bought the Crossroads Street property, they learned "the previous lender on the property" intended to auction the property for sale because a prior lien had not been extinguished. A Pacific Holdings retained an attorney and contacted its title company. The parties eventually reached a civil settlement in which the bank took back the property and A Pacific Holdings got its purchase money back.

At trial, an authorized representative from Bank of America reviewed the series of recorded documents that purported to transfer interest in the Crossroads Street property to Roland's company Ananias & Sapphira, and then to A Pacific Holdings. He testified that Bank of America, which, as the servicer of Angela and Arnel's loan, had complete authority over the loan, did not authorize any of these documents or transactions, and that they were filed to cloud title on the property and prevent the bank from foreclosing.

4. *Uncharged Incidents:  Arthur D. and Alam K.*

Arthur D. and his wife purchased a home in San Clemente in 2002, but in 2008 began experiencing financial difficulties and fell behind on mortgage payments.  Arthur received a notice of default in 2011 and later a notice of trustee sale.  A friend introduced him to Roland.  When they spoke on the phone, Roland told him he had experience working with lenders and "knew the problems behind what they were doing."  Roland told him he could save Arthur's house through a four-phase process.  A payment was required at each phase.  Arthur made an initial payment of $3,500.  Arthur had several forms notarized "and sent off" at Roland's direction.  In total Arthur paid Roland $17,500.

Roland said he needed another $2,500 to $3,000 to file a lis pendens to prevent the trustee sale, but Arthur refused to pay more.  Roland agreed to do the paperwork for free this time, but when Arthur got to court, he learned he had the wrong paperwork.  Arthur worked with the court clerk to fill out the proper forms to file a lis pendens to delay the trustee sale of the house.

Later, Roland gave Arthur a deed in lieu of foreclosure to sign, but Arthur recognized this would transfer ownership of the home and refused to sign it.  Soon thereafter, Arthur was "sued by Bank of America for fraud and for collusion with Roland . . . to perpetuate [a] fraud."  At that point, Arthur started "to question if this thing is really a scam, which [he] came to believe it was."  He had to defend himself in the lawsuit and received no help from Roland.  He learned several other people were also victims of Roland's scheme.

Arthur sent Roland a written demand for his money back but never heard back from Roland, and never got his money back.  Ultimately, Arthur sold his home through a short sale process without Roland's assistance.

Alam K. lived with his family in a home in Rancho Cucamonga until about 2007, and then rented it out when his family moved to a new home. The monthly payment on the home's adjustable rate mortgage began to increase, and Alam began to get behind in payments.  In 2011, he received a notice of default.  A friend referred him to Roland.  He reviewed Roland's website and believed he was "a wizard."  Links on his website showed Roland on television, talking about what his company can do.  He later met with Roland, who seemed "very knowledgeable."  Roland described the process he would use to save the property.  Alam did not understand the process, but Roland told him not to worry and to follow Roland's directions.  Alam decided to use Roland's process for both of his homes and paid $35,000 up front.  He paid $110,000 in all.

Roland told Alam that to do a loan modification, he had to transfer the property into a trust, so Alam did.  Roland also filed multiple documents on Alam's behalf that Alam was not aware of.  Roland told Alam his lender Bank of America had sold his loan to a new lender, InterBank.  His payments to InterBank would be $2,000 per month, and he could pay off the $350,000 loan within two years, with no interest, but after that the interest rate would be 16 percent.  Alam stretched his finances and sold personal property to pay off InterBank's loan in six months.  He later sold the home and thought the process had worked in "the legal way."  However, within a few months, he was sued by Bank of America and the homebuyer.  About the same time, Roland told him he had a buyer ready for his other home, but Alam told him he would not proceed because he knew Roland was lying to him.  He had to hire an attorney and litigated with Bank of America for years before settling the suit.

5. *Evidence of Prior Civil Settlement*

An attorney employed by MERSCORP Holdings, the parent company of MERS, testified on MERS's behalf.  MERS is a company that holds title to the secured interest in the home as an agent for the benefit of the lender that makes the loan to the homeowner, and as an agent for the aggregator who pools the loans for sale in the secondary market.  Roughly three of four mortgages are registered on the MERS system at the time of origination.

In 2011 MERS filed a civil lawsuit against Roland when it came to their attention that Roland was signing his name as an agent of MERS to transfer MERS's interest to Roland's own company Restoreloution.  Roland did not work for and was not an agent of MERS.  The lawsuit was ultimately resolved when Roland signed a stipulated judgment promising that he would not engage in any of the following conduct:  (1) impersonating or using MERS or any confusingly similar designations or names on any document; (2) signing, executing, preparing and/or causing to be prepared any documents on behalf of MERS or any confusingly similar designations; and (3) recording or submitting any documents to be recorded in any city or county public land records that are purportedly signed by any person or entity on behalf of MERS, or confusingly similar designations.  The prosecution introduced as evidence both the stipulated judgment and a copy of MERS's complaint against Roland.[6]

B.  *Defense Case*

Two of Roland's daughters testified he was a religious man, he was honest, and he tried to help people.  The current charges did not alter their view of their father's veracity.  They acknowledged that Roland had a 2000

---

[6]    The MERS lawsuit and the civil settlement resolving it are discussed in further detail in Section III, *post*.

felony conviction for loan fraud, but that conviction did not change their views of him.  They were unaware that in 2011 Roland had admitted fraudulently signing documents as a representative of MERS but testified that knowledge would not change their views of him.

Roland testified on his own behalf.  He has college degrees in accounting and finance.  After graduating, he worked as a certified public accountant at an accounting firm where he audited financial statements for financial institutions.  He later worked at a mortgage company and then in a bank before becoming a mortgage broker.

Roland's company Restoreloution "start[ed] off as a ministry."  When the 2008 mortgage crisis began, he began to help people with their loans to avoid foreclosure.  He used scripture in advertising his services on his website, explaining at trial that he concluded the "banks were operating wickedly," and drawing analogies to biblical references.  Roland previously had a business partner named Arlando "Ray" Jacobs, but by the time Susan and Angela and Arnel retained his services, Roland was on his own.

Roland admitted to having between 20 and 30 companies, including Restoreloution, TILA Corporation, Ananias & Sapphira, InterBank Loans, REO Services, Federal National, National Services, United National Title, and United Title Company.  He testified he created the companies to help people going through foreclosure proceedings and described his business as "foreclosure consulting."  Roland claimed he used InterBank to place "protective" liens "to reflect the interest that [he had] in the property" and to secure payment of his fees.  He described InterBank as "a loan servicing company," and stated it did not lend money.

Roland denied telling the Federal Bureau of Investigation (FBI) that he created InterBank to be a fake lender to use in fraudulent deeds of trust.  He

acknowledged the FBI had recorded him telling a client the liens were "fake," but claimed he only meant he would not enforce the liens against the client. Roland denied that he and his former partner Jacobs created a scheme by which they would stop foreclosure by clouding title with false documents; then set up a loan through a fraudulent deed of trust, and then selling the property based on the false documents, with proceeds split evenly between them. He claimed he did not remember a conversation with an FBI agent in which he said that.

Roland hired Donna Gilmore, Mitchell VanBuren, Angie Garcia, Connie Benino, Joshua Stein, and Stephen Dockery to sign documents at his direction on behalf of companies he controlled.[7] He acknowledged these individuals also purported to sign as "authorized agents" of various banking institutions; he testified that he believed he had authority to direct them to do so.

Roland claimed that through his experience working in the mortgage industry, he knew how individuals or corporations could "cancel their mortgage." Roland claimed there were provisions in deeds of trust and under federal law—particularly 15 United States Code section 1635—which allowed people to cancel their loans. Roland claimed if the trustee under the deed of trust or a borrower sent a notice of intent to cancel and the lender failed to respond, the person sending the notification had "the right to take action to remove that lien or loan from the title report."

He claimed banks were "doing things wrong" and were involved in predatory lending, so he "sought to assist people using Title 15

---

[7]    Roland testified that Lucila "Lu" Jones was not his employee, but rather a businesswoman he worked with who had a vast network of real estate contacts and "was skilled at putting buyers and sellers together."

[section] 1635." Appellant testified that the Truth in Lending Act or "TILA," 15 United States Code sections 1601 et seq., was the centerpiece of the services provided by his companies, Restoreloution Trustee, Federal National Services, and Truth in Lending Associates or TILA Corp., which he named after TILA. He claimed to have read all TILA provisions and the relevant cases regarding those provisions. He relied on various provisions of 15 United States Code sections 1601, 1602, 1603, and 1635 to enable his clients to exercise their "right to rescind their . . . loan." He claimed applicable law including 15 United States Code section 1635 allowed homeowners to rescind their mortgages within three years after the loan was consummated or foreclosure proceedings began (whichever was later). He claimed if a homeowner offered to return the property via a deed in lieu of foreclosure, and the lender did not respond by taking possession within 20 days, the homeowner would own the property without having to pay the loan. When the lenders failed to respond within the 20-day period, Roland claimed he was entitled to file documents to " 'take control of the title.' "

Roland acknowledged that subdivision (e) of 15 United States Code section 1635 states that section expressly exempts residential mortgage transactions from its application; however, he claimed other provisions stated that residential mortgages are covered by TILA if the home is a principal dwelling.

To begin Roland's process, his clients were required to give him a "trust directive" authorizing him to take action on behalf of their deeds of trust. Roland claimed his clients "wanted [him] to take title to the property to . . . cloud it . . . ." He had them transfer ownership of their property to a trust and appoint him trustee, allowing him to file a "substitution trustee," whereby he would take the place of the original trustee under the original

20

deed of trust and be able to sign title documents and sell the property.  He acknowledged that the homeowners were not aware of the substitution of trustee, corporate assignments, or trustee deeds he had filed with respect to their properties.

Roland described the four phases of his business model.  During phase 1, he used a law firm or legal group to do a "forensic audit" of the homeowner's loan to determine if the homeowner had received the proper loan disclosures and qualified for his "process."  A homeowner would qualify if they had an institutional loan issued under a credit memo and issued a Truth in Lending statement.  After the person signed a fee agreement, Roland would send notices on the client's behalf to send to the bank, the FBI, the Department of Justice, and other government agencies, alleging the bank had engaged in predatory lending practices.  Under the fee agreement, Roland's primary "legal responsibilities" were to act as a trustee under the homeowner's deed of trust to assist them in their mortgage issues.  He "put as many disclaimers as possible so that [the homeowners would] know there's no guarantee . . . ."

In phase 2, Roland would provide a notice of cancellation or rescission for the client to send to the bank.  The bank was required to respond within 20 days.  In phase 3, the client-homeowner would send documents to the bank giving the opportunity to cure the notice of rescission.  Roland also would record a deed in lieu of foreclosure, tendering the property to the bank, and send the bank a copy, "to start that twenty-day period of time before we take action against the title."  In phase 4, Roland would send the bank a notice of quiet title and consent to judgment, indicating the bank had consented to judgment and would cease collection activities.

Roland acknowledged the MERS lawsuit and admitted entering the civil settlement with MERS in 2011.  He acknowledged that under the settlement, he agreed not to use the MERS name or represent MERS in any way.  He agreed to the settlement because he acknowledged his wrongdoing in those circumstances.  He acknowledged that for documents associated with both the Caminito Barlovento and Crossroads Street properties, after entering the MERS settlement, he directed his employees to sign on behalf of other financial institutions.

Roland claimed the circumstances were not the same.  In the MERS case, he prepared documents that purported to represent MERS, but he "didn't always get the substitution in the right order" which resulted in his "errors."  He claimed, however, that he subsequently "perfected . . . the title process" so that he "[did] the substitution first," which, under the "standard in the industry," allowed every document filed to "represent[] an action by the trustee."  Under his theory, "even though it looks like you're signing for Bank of America, U.S. Bank, title whatever it is," once he substituted in for the trustee, he was authorized to sign on their behalf.  He testified that, "outside of recording the substitution correctly, it would appear to a layman that it's a fraudulent document, but that's not the case."

He acknowledged he was convicted of felony loan fraud in 2000 and that, in connection with his plea, he admitted he fraudulently filed loan documents on behalf of his clients without their authorization for a loan of $75,000.  He admitted that, without his client's consent, he prepared two false income tax returns and submitted them to the bank as part of the loan application to inflate the client's adjusted gross income.  He further admitted, in connection with a loan package he prepared, he created and filed a false

mechanics lien for $20,000, pursuant to which he would receive loan proceeds in the event of a payoff.[8]

He acknowledged he purchased two notary stamps for $500 each, along with an "authorization to use them," in the names of F. Vasquez and Ming Li. He acknowledged those stamps were found in his home.

Roland acknowledged that under Civil Code section 2945 et seq., which regulates foreclosure consultants, such consultants are prohibited from demanding or receiving payment until they have performed the services; from charging any fee exceeding ten percent per annum of the amount of any loan the foreclosure consultant may make; from taking a lien on real property to secure payment of their services; from acquiring any interest in a residence in foreclosure from the owner with whom the foreclosure consultant has contracted; or from taking any power of attorney from the owner for any purpose. Roland claimed he did not have to comply with these laws because he was not a foreclosure consultant, which is defined as including anyone who offers to perform or performs, for compensation, any services which the person in any manner represents he will stop or postpone a foreclosure sale. Roland claimed he was a "substitute trustee" providing trustee, debt restructure, and liquidation services, which were not covered by that law, but

---

[8]     Roland tried to minimize his actions, testifying that he did not think his plea "would be a big deal" at the time, he "never really considered [himself] a criminal because [he] did those things," he "immediately admitted to it" when he was shown "that [he] may have made an infraction," and rather than going to trial he "just said, 'Oh.  Well, yeah, I did that,' you know. I made those mistakes."  He also tried to suggest he did not commit the offenses, stating "I mean, it may be what I pled to, but that's not true"; and "Well, just like any plea deal, you plead to things that didn't happen exactly as are stated."

admitted stopping or postponing a foreclosure was "incidental to [his] service."

Roland acknowledged that the individuals in the instant case hired him to save their homes.  When Angela and Arnel initially approached Roland, they wanted to save their property.  He was aware they had a loan modification agreement but were unable to make the payments.  They signed a contract to retain his services.  Roland acknowledged his fee agreement with Angela and Arnel provided they would pay a fee up front and make monthly payments thereafter.

Trying to save their property, Angela and Arnel transferred their property to their own trust.  Roland then had them execute a promissory note in favor of Roland's company InterBank for $720,000 (the amount owed under their original loan), plus $27,000 (the amount of Roland's unpaid fees).  The promissory note was secured by a deed of trust against their Crossroads property in favor of InterBank.  Roland admitted he took this interest to secure payments for his services.[9]  Roland also had Angela and Arnel sign a power of attorney, authorizing Roland, through his company Federal National Services, to act on their behalf with regard to the property.  On that same date, Angela and Arnel signed a notice of right to cancel.

Roland told Angela and Arnel they needed to decide whether they wanted to continue living in their house, which would involve hiring attorneys for continued litigation, or to liquidate their property "because,

---

[9]     Roland stated he may have "mistakenly" referred to the promissory note as "a fake lien or a fake loan," but stated it was not fake.  He claimed he would not enforce the lien against the homeowner, but stated it was a protective lien reflecting "the amount [the homeowners] would owe [him] as a credit memo in the event that [he] sell[s] the property."

ultimately, the property would be taken or sold out from underneath them."
He claimed they then "chose the liquidation option."

For the liquidation option, Restoreloution became the trustee, giving
Roland the power to sell the property.  Roland later served a "[d]eed in [l]ieu"
on the bank.  When the bank failed to respond within 20 days and cure its
"default," he substituted his company Federal National Services as the
trustee under the deed of trust per the "trust directive" the couple signed.

He transferred the property to his company Ananias & Sapphira, and
then sold the property for $455,000.  Roland paid Angela and Arnel about
$168,000 and kept the balance of the sale proceeds for himself.  Roland
admitted that amount—nearly $290,000—exceeded the statutory maximum
of ten percent for a foreclosure consultant's fee.

Roland claimed he did not promise Angela and Arnel he could save
their home or that they would be able to continue living there.  He claimed he
promised only to "defend [their] title."

Roland denied he filed the various documents to cloud title to the
homeowners' properties.  While acknowledging his actions "may have the
effect of clouding" title, he nonetheless claimed that he filed the documents in
"an effort to control the title" rather than to cloud title.  He claimed none of
the documents he filed was fraudulent because "in each and every case, [he]
recorded a [s]ubstitution of [t]rustee."  He claimed "the rule of the [d]eed of
[t]rust" was that the current trustee can sign a document on behalf of the
previous trustee, without having to "coordinate" with them.

Roland claimed he took Susan on as a client without having her pay up
front because she told him she wanted to kill herself because her property

was in foreclosure.[10]  He claimed she initially wanted to save her house, but quickly changed her mind and asked to learn more about the liquidation process because "she was very vulnerable" and needed money.  Roland acknowledged that, after filing documents to transfer Susan's property to his company, Ananias & Sapphira, and filing a deed of trust on the property in favor of his company InterBank, Roland then sold the property for about $625,000.  Roland acknowledged that, between the proceeds he received through Ananias & Sapphira and InterBank, he received approximately $584,000 from the sale.  After he paid Susan $170,000, Roland pocketed over $400,000 from the sale.

Roland also admitted he received $32,000 from Mike K. for his services.

Roland denied taking more than $950 from Susan, Angela and Arnel, A & D Enterprises, or A Pacific Holdings by false pretenses, and denied filing any false or fraudulent documents.

C. *Prosecution's Rebuttal*

FBI Special Agent Hanley testified that he met with Roland in 2018. During their conversation, Roland "laid out a four-phase plan" that he and his partner Jacobs used to "try[] to stop foreclosure on these homes when, in effect, what they were doing was stealing homes out from under the legitimate lender."  Hanley's interview with Roland "essentially consisted of [Roland] admitting to forging a number of documents involved in that process."  Roland's role was to control the bank accounts that would receive the money generated by this scheme to steal the homes.  They went through

---

10    Roland's testimony that Susan paid no money "up front" was consistent with Susan's testimony that she and Roland agreed, because she could not pay the $25,000 fee in advance, the "proceeds [from the sale of her home] would be reduced to cover [her] fees."

documents together and Roland "would essentially tell us, you know, whether he or Mr. Jacobs forged that particular document, how it was notarized, whether the notary was real or fake." The special agent said Roland provided the following details of the scheme:

> "Filing fraudulent documents in order to not only cloud the title and stop—basically delay foreclosure on—on these properties but also re-deed them fraudulently from the legitimate owner and place them into entities, transfer the ownership of those entities to—or transfer the ownership of those properties to entities under their control and then set up a—create a false fraudulent [d]eed of [t]rust to make it appear that there was a loan on those properties. Then they would turn around and sell those properties. And when the title company paid off the—what was a fraudulent loan, they would communicate with them and find out what the payoff amount was. The title company would then wire those funds to an account that was controlled by Mr. Roland and Mr. Jacobs."

The special agent stated he had talked with Roland specifically about the Caminito Barlovento property. Roland had admitted that "Joshua Stein" was an alias he used to sign several fraudulent documents. Roland also explained to the agent how he paid $500 for notary stamps with the names of F. Vasquez and Ming Li. Roland admitted to the special agent that InterBank was an entity he created to pose as a bank to use as a purported lender on these properties.

### Verdict and Sentence

At the conclusion of the prosecution's case, on Roland's motion, the trial court dismissed counts 1 through 15 on the ground that they were barred by the statute of limitations (§§ 1118.1, 801). At the close of trial, the jury found Roland guilty on the remaining counts and found true the alleged enhancements.

At sentencing, the trial court stated:

> "[Roland's] claim that he thought what he was doing was completely legal under the various statutes and everything, I think is nonsense.  For anybody to claim that they thought you could send a letter to a mortgage holder and in 20 days have the property now free and clear because they didn't respond to a letter is nonsense.  And the Defendant is clearly an intelligent man.  So for him to be asserting that that's what he honestly thought, I think is . . . nonsense.  I don't believe for a second that he really thought that . . . this property was free and clear.  And I think that's evidenced by the fact that he utilized fraudulent signatures of people, signing in somebody else's name, signing on behalf of an entity that the Defendant knew full well he was not an authorized representative of them.  Having notarizations that were fraudulent, clearly fraudulent, I think evidences the knowledge and intent of the Defendant."

The trial court sentenced Roland to a total term of 11 years in state prison.

## DISCUSSION

### I.

*Sufficiency of the Evidence in Support of Grand Theft Convictions*

Roland contends his grand theft convictions in counts 17 and 18 (Caminito Barlovento) and 26 and 27 (Crossroads Street) must be reversed for insufficient evidence of his intent to defraud his victims.[11]  We disagree.

---

[11]   In the respective counts, Roland was convicted of grand theft of personal property of Susan S. (count 17), A & D Enterprises (count 18), Angela and Arnel R. (count 26), and A Pacific Holdings (count 27).  Roland contends what is required is "consideration of the evidence as to Roland's specific intent and representations to those four named 'victims,' and whether those persons/entities parted with property as a result."  We agree, and we conclude that consideration of the evidence overwhelmingly supports the four grand theft convictions.

"In assessing a claim of insufficiency of evidence, [this court's] task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 (*Rodriguez*).)  Reversal for insufficient evidence is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

" ' "The crime of grand theft is complete when a man takes property not his own with the intent to take it, and a defendant may be convicted of grand theft upon proof of facts establishing (a) embezzlement, (b) larceny or (c) obtaining property under false pretenses. . . ." ' "  (*People v. Hussain* (2014) 231 Cal.App.4th 261, 272, fn. 5.)  The prosecution here pursued a theory of theft by false pretense.  As such, the prosecution was required to prove three elements:  (1) Roland knowingly and intentionally deceived a property owner by false or fraudulent representation or pretense; (2) he did so intending to persuade the owner to let him or another person take possession and ownership of the property; and (3) the property owner let Roland take possession and ownership of the property because the owner relied on the

29

representation or pretense.  (§ 484, subd. (a); CALCRIM No. 1804; see *People v. Wooten* (1996) 44 Cal.App.4th 1834, 1842.)[12]

The jury was instructed that someone makes a false pretense if intending to deceive he does one or more of the following:  (1) gives information he or she knows is false; (2) makes a misrepresentation recklessly without information that justifies a reasonable belief in its truth; (3) does not give information when he or she has an obligation to do so; or (4) makes a promise not intending to do what he or she promises.  (CALCRIM No. 1804; see *People v. Ashley* (1954) 42 Cal.2d 246, 263-265.)  The jury was further instructed that the return or offer to return some or all of the property wrongfully obtained is not a defense to the charge of grand theft. (CALCRIM No. 1862; see *People v. Pond* (1955) 44 Cal.2d 665, 674 (*Pond*) ["Restoration of property feloniously taken or appropriated is no defense to a charge of theft."].)

For the crime to qualify as *grand* theft, the value of the property taken must exceed $950.  (§ 487, subd. (a).)  The jury was instructed that, in determining the value of the property taken, the value of property is the fair market value of the property.  (CALCRIM No. 1801.)

---

12    Section 484, subdivision (a) states in part:  "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft."

Here, there was ample evidence to support each of the four grand theft convictions.  When Susan told Roland she wanted to stop foreclosure and stay in her home at Caminito Barlovento, Roland assured her he could prevent the foreclosure but told her she would have to sell the home.  He promised there would be proceeds from the sale, and promised her 50 percent of them.  She believed her home would be sold through legal means.  Susan agreed to pay Roland's $25,000 fee; however, because she did not have the money to pay up front, she agreed the fees would be deducted when the home was sold.  Roland filed a series of documents purporting to transfer title in Susan's home to his company Ananias & Sapphira.  When the home was subsequently sold for $625,000, Susan received a fraction of the proceeds from the sale while Roland kept most of the proceeds.

Angela R. reviewed the website where Roland appeared to be very religious and professional, and spoke about helping homeowners with problem loans.  Roland told Angela and Arnel he had a four-phase process that "really helps the homeowners," that he was "going to fight the bank," and that, "in the end, the homeowners get a settlement."  He explained that the process was expensive because it was long and there were a lot of people involved.  Angela and Arnel told Roland they could not afford the fee for his program, so he arranged an installment payment system for them.  In all, they paid Roland $23,500.  Even though they did not understand the documents Roland had them sign, Angela and Arnel participated in Roland's process because they relied on his expertise and trusted that his process would stop the foreclosure sale of their home at Crossroads Street.  They believed Roland was legitimate.  Roland filed a series of documents purporting to transfer title in their home to his company Ananias & Sapphira.

After purporting to acquire title to both the Caminito Barlovento and Crossroads Street properties from the homeowners, Roland then offered the properties for sale to unwitting homebuyers. A & D Enterprises purchased the Caminito Barlovento property from Ananias & Sapphira for $625,000. A Pacific Holdings purchased the Crossroads Street property from Ananias & Sapphira in a cash transaction for $455,000. The buyers of both properties were later surprised to learn of preexisting loans on the properties. In the end, both the buyers and both original homeowners became embroiled in litigation with the banks.

In short, Roland represented to the homeowners he had a legitimate process that could save them from foreclosure and reach a settlement with their lenders. He did not. His scheme was fraudulent. Both homeowners paid Roland for his services—Angela and Arnel paid up front and Susan paid from her purported "settlement"—and both homeowners transferred ownership of their homes to Roland. Roland used fraudulent documents notarized by fictitious notaries to affect these transfers. Then he marketed the homes as if his title to them was legitimate and clear of preexisting liens, and sold the homes to innocent investors, pocketing approximately $690,000 for himself. Roland represented to the purchasers through grant deeds and escrow instructions that his company was the legal owner of the properties, but it was not. Roland's actions were not authorized by the legitimate lienholders on the properties.

This evidence supports the findings that Roland knowingly and intentionally deceived homeowners by false or fraudulent representation or pretense that he had a legal process for keeping their homes and avoiding foreclosure; that he did so intending to persuade the homeowners to let him take possession and ownership of the property; and that the homeowners let

32

Roland take possession and ownership of their money and property because they relied on Roland's representation or pretense. (§ 484, subd. (a); CALCRIM No. 1804.)  With respect to the homebuyers, the evidence supports the findings that Roland knowingly and intentionally deceived the buyers by false or fraudulent representation or pretense that he could convey title free and clear of all liens; that he did so intending to persuade the homebuyers to let him take possession and ownership of the purchase money, and the homebuyers let Roland take possession and ownership of these funds because they relied on Roland's representation or pretense. (§ 484, subd. (a); CALCRIM No. 1804.)  The evidence further supports the finding that Roland intentionally used false pretenses to deceive both the homeowners and buyers by either giving information he knew was false, by making misrepresentations recklessly without information that justifies a reasonable belief in its truth, or by making promises to both the homeowners and buyers, not intending to do what he promised (e.g., he had a legitimate process to stop the homeowners' foreclosures, and he held legitimate title to the properties that he was authorized to transfer to the homebuyers). (CALCRIM No. 1804.)  The value of the money or property Roland obtained in each transaction far exceeded $950. (§ 487, subd. (a), CALCRIM No. 1801.) It is no defense that some or all of the property wrongfully obtained was ultimately returned to the victim. (*Pond*, *supra*, 44 Cal.2d at p. 674; CALCRIM No. 1862.)  The evidence is therefore sufficient to establish that Roland committed all four counts of grand theft.

Roland contends, as he did at trial, that he believed his process was justified under the law.  He maintains that, even if his interpretation of the law was mistaken, nonetheless it negates any inference of criminal intent. Roland's reliance on his version of events misapplies the substantial evidence

standard of review, which requires that we construe the facts and inferences drawn from those facts in the light most favorable to the judgment. (*Rodriguez*, *supra*, 20 Cal.4th at p. 11.)  As discussed, there was ample evidence in the record from which the jury could infer that Roland either intended to deceive his victims by making representations he knew to be false, or at least made such representations recklessly without reasonable justification.  (CALCRIM No. 1804.)  As the trial court remarked at sentencing, "His claim that he thought what he was doing was completely legal under the various statutes . . . is nonsense."  The jury reasonably rejected Roland's contention he lacked fraudulent intent.

Roland relies on *People v. Sanders* (1998) 67 Cal.App.4th 1403 to contend that recording forged deeds is not theft, and thus he did not steal anything.  Roland's reliance on *Sanders* is misplaced.  In *Sanders*, defendant's convictions for theft of real property were reversed "for the reason that nothing was taken:  A forged deed does not convey title to its immediate grantee."  (*Id*. at p. 1409, fn. 9.)  The defendant had no contact with any of the property owners, including six of them who had died before their forged signatures were placed on the deeds that were later recorded. (*Id*. at pp. 1406-1407.)  Here, by contrast, Roland had extensive contact with the victims, title to the properties was conveyed, and the victims were induced by Roland's misrepresentations and pretenses to transfer title to their properties.  Unlike the defendant in *Sanders*, Roland did not merely forge false deeds and cause them to be recorded.  He orchestrated a scheme in which he falsely represented to homeowners he could save their homes from foreclosure, charged them for his services, purported to take title to the properties by recording false, unauthorized documents, and then made substantial profit from innocent investors, whom he enticed into purchasing

the homes by marketing them as if he was the legitimate title holder and authorized to transfer clear title.[13]

Roland agrees the jury was properly instructed regarding mistake of fact and mistake of law but contends the jury must not have followed the instructions.  With respect to mistake of fact, the jury was instructed, in part: "The defendant is not guilty of Penal Code section 487 (Grand Theft) if he did not have the intent or mental state required to commit the crime because he did not know a fact or mistakenly believed in good faith a fact."  (CALCRIM No. 3406.)  Regarding mistake of law, the jury was instructed:  "It is not a defense to the crime of Penal Code [section] 115 (Filing a False Document) that the defendant did not know he was breaking the law or that he believed his act was lawful."  (CALCRIM No. 3407.)  We presume the jury followed these instructions.  (*People v. Martinez* (2010) 47 Cal.4th 911, 957.)  Other than mere conjecture, Roland offers no reason to abandon this presumption.  Based on the record, the jury reasonably rejected Roland's claim that he was acting under the mistaken belief that his actions were entirely lawful.

We thus reject Roland's contentions and conclude substantial evidence supports Roland's four convictions for grand theft by false pretense.

## II.

### *Evidence of Prior Misconduct*

The trial court denied Roland's pretrial motion to exclude the testimony of Alam K. and Arthur D. as evidence of Roland's common scheme, concluding

---

[13]     Roland also relies on *People v. Beaver* (2010) 186 Cal.App.4th 107 and *People v. Braver* (1964) 229 Cal.App.2d 303, but those cases do not assist him. (See *Beaver*, at p. 121 [reversing grand larceny conviction after concluding the offense "was theft by false pretenses, not larceny"]; *Braver*, at pp. 306-307 [trial court erred in not allowing defendant to present evidence to support his claim that he lacked the required criminal intent to defraud anyone].)

the probative value of the evidence was not outweighed by the potential for undue prejudice.  (Evid. Code, §§ 1101, subd. (b), 352.)  Roland contends the evidence was irrelevant and prejudicial, and its admission was erroneous under Evidence Code section 352.

" 'Evidence Code section 1101, subdivision (a) sets forth the " 'strongly entrenched' " rule that propensity evidence is not admissible to prove a defendant's conduct on a specific occasion.'  [Citation.]  'At the same time, "other crimes" evidence is admissible under Evidence Code section 1101, subdivision (b) "when offered as evidence of a defendant's motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident in the charged crimes." ' "  (*People v. Erskine* (2019) 7 Cal.5th 279, 295 (*Erskine*).)

"Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent."  (*People v. Kipp* (1998) 18 Cal.4th 349, 369 (*Kipp*).)  " 'In this inquiry, the degree of similarity of criminal acts is often a key factor, and "there exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought:  'The least degree of similarity . . . is required in order to prove intent . . . .'  By contrast, a higher degree of similarity is required to prove common design or plan, and the highest degree of similarity is required to prove identity." ' "  (*Erskine*, *supra*, 7 Cal.5th at p. 295.)

If the trial court determines the evidence is relevant and admissible under Evidence Code section 1101, it must next "proceed to examine whether the probative value of the evidence of defendant's uncharged offenses is 'substantially outweighed by the probability that its admission

[would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404 (*Ewoldt*).)

" ' "We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." ' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 667-668.)[14] "A court abuses its discretion when its ruling 'falls outside the bounds of reason.' " (*Kipp*, *supra*, 18 Cal.4th at p. 371.)

Roland does not contend that the evidence was erroneously admitted under Evidence Code section 1101, subdivision (b). Rather, he contends the evidence was irrelevant, cumulative, and more prejudicial than probative, and erroneously admitted under Evidence Code section 352. We disagree.

There is no serious dispute that the evidence was relevant to the issue of common design or plan. " 'The presence of a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done.' . . . Evidence of a common design or plan . . . [is used] to prove that the defendant engaged in the conduct alleged to constitute the charged offense." (*Ewoldt*, *supra*, 7 Cal.4th at pp. 393-394.) "[E]vidence of a defendant's uncharged misconduct is relevant where the uncharged misconduct and the charged offense are sufficiently similar to support the inference that they are manifestations of a common design or plan." (*Id.* at pp. 401-402.) For evidence of uncharged misconduct to be admissible to show a common plan, it "must demonstrate ' "not merely a similarity in the results, but such a concurrence of common features that the various acts are

---

14    To the extent Roland suggests this issue presents a mixed question of law and fact and should be reviewed de novo, we reject his claim and apply an abuse of discretion standard of review.

naturally to be explained as caused by a general plan of which they are the individual manifestations." [Citation.]' [Citation.] To show a common design, 'evidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts.' " (*People v. Leon* (2015) 61 Cal.4th 569, 598 (*Leon*).)

Roland's plan, as described by both Arthur and Alam, easily shared the requisite concurrence of common features with the plan he used with the victims: desperate to save their homes, the homeowners sought help from Roland; Roland told them he had a multi-phase, document-intensive "process" to save their homes from foreclosure upon payment of a fee; he provided them with fraudulently created documents to be filed in the county recorder's office; the documents clouded the title to their homes which forestalled foreclosure; Roland purported to transfer title to their homes to a company he owned; and Roland filed more fraudulent documents purporting to transfer the liens of the legitimate lenders to a company he controlled. Ultimately, the homeowners' lenders sued them for fraud. The evidence was thus relevant to show Roland committed the charged offenses pursuant to the same plan he used to commit the uncharged acts. (*Leon*, *supra*, 61 Cal.4th at p. 598.)

We also reject Roland's contention that the probative value of the evidence was outweighed by the potential for prejudice. Roland claims Arthur and Alam "painted a picture of Roland as a 'bad guy' who failed to assist them once they were faced with legal challenges to his plan, and caused them to suffer significant monetary losses." He further claims this evidence "painted a picture of Roland, which was contrary to his explanation

of trying to help homeowners, but also contrary to that of [Susan] and [Angela and Arnel]," who, he claims, only benefitted from participating in his process. Roland's arguments ignore the common features between the charged offenses and uncharged acts, as noted *ante*. Moreover, Roland ignores that the victims in the charged offenses also faced significant hardships: their testimony described the lawsuits and stress they faced and their loss of money, time, and reputation. "The testimony describing [Roland's] uncharged acts . . . was no stronger and no more inflammatory than the testimony concerning the charged offenses." (*Ewoldt*, *supra*, 7 Cal.4th at p. 405.) The probative value of the evidence was not outweighed by any potential for undue prejudice (Evid. Code, § 352) because the prejudice courts consider in applying Evidence Code section 352 " 'is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence" (*ibid*.) like the common plan evidence adduced from the testimony of Arthur and Alam.

We further reject Roland's contention the evidence was cumulative. The evidence was highly probative to demonstrate that Roland used a common plan on his victims to cloud and transfer title from the legitimate lienholder, in his favor, with fraudulent intent—a central disputed issue at trial. (Cf., *People v. Williams* (2009) 170 Cal.App.4th 587, 611 [concluding it is an abuse of discretion to admit cumulative evidence concerning issues *not* reasonably subject to dispute].) Under the circumstances, the trial court's decision to admit the evidence fell well within the bounds of reason. (See *Kipp*, *supra*, 18 Cal.4th at p. 371.)

Further, the trial court properly instructed the jury the uncharged act testimony was offered "for the limited purpose of deciding whether the defendant had a plan or scheme to commit the offenses alleged in this case," to "consider the similarity or lack of similarity between the uncharged offenses and the charged offenses," and the evidence "is not sufficient by itself to prove that the defendant is guilty of filing false documents or grand theft. The People must still prove each charge and allegation beyond a reasonable doubt." These limiting instructions minimize any potential danger the jury might rely on the evidence for an improper purpose. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1119.) We thus reject Roland's claim the evidence was erroneously admitted.

Even assuming the evidence was erroneously admitted, any error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [error is reversable if there is a reasonable probability that a result more favorable to defendant would have been reached in absence of error]; *People v. Felix* (2019) 41 Cal.App.5th 177, 187 (*Felix*) [applying *Watson* harmless error test to consideration of evidence pursuant to Evid. Code, §§ 1101 and 352].) Arthur and Alam's testimony regarding the uncharged incidents was brief when viewed in the context of the entire trial record.[15] Meanwhile, there was overwhelming evidence that Roland used a fraudulent scheme—intending to defraud both the homeowners and unsuspecting buyers, and benefiting himself. In sum, various employees signed as the lenders' authorized agents when Roland knew they were not authorized; Roland used fictitious notaries (after purchasing notary stamps for $500 each), and law enforcement could find no evidence that either notary existed; Roland had a prior felony

---

15   The evidence was adduced from two witnesses in less than half a day. All of the witness testimony consumed a total of six days.

conviction for filing false loan documents; Roland entered into a stipulation agreeing, inter alia, not to execute documents purporting to be on behalf of MERS; Roland attempted to minimize his prior actions in pleading guilty to a felony and entering into the MERS stipulation; Roland used an alias (Joshua Stein) to sign false documents; and Roland admitted to the FBI that he created InterBank to be a fake lender to use in fraudulent deeds of trust, and the FBI recorded him telling a client the liens were fake.  In his own testimony, Roland admitted nearly all the elements of the offenses yet maintained he lacked the requisite criminal intent.  The jury reasonably rejected Roland's self-serving testimony that he believed his scheme was legitimate and authorized by law.  We conclude there is no reasonable probability that a result more favorable to Roland would have been reached in the absence of the uncharged act evidence.

We further reject Roland's claim that admission of the evidence violated his due process rights and resulted in a fundamentally unfair trial. He claims the evidence "allowed the potential of a verdict based on innuendo and speculation as to his intent in the transactions at issue in this case . . . ." We have already rejected Roland's claim the uncharged incidents lacked relevance to the charged offenses and concluded the evidence was highly probative of Roland's use of a common scheme to cloud and purport to transfer title from the legitimate lienholder, in his favor.  "Because the evidence was material, probative, and admitted under Evidence Code section 1101[, subdivision] (b) on the legitimate issue of intent, defendant's due process right to a fair trial was not transgressed by the admission of such evidence."  (*People v. Rogers* (2013) 57 Cal.4th 296, 332.)

III.

*Evidence of Prior Civil Settlement*

A. *Additional Factual Background*

In May 2011, MERS filed a complaint against Roland and his company Restoreloution.  The complaint alleged that Roland was involved in a fraudulent scheme to cloud the chain of title to real property, attempt to eliminate the security interest created by a deed of trust, and forestall foreclosure.  To effectuate the scheme, Roland had executed and recorded false documents—using the MERS name (or a nearly identical name)—that purported to transfer MERS's property interest first to himself, and subsequently to other individuals, in a transaction in which he was to obtain $300,000 for his services.

In December 2011, Roland and MERS entered a stipulated judgment, permanent injunction, and court order (stipulated judgment) to resolve the litigation.  In the stipulated judgment, Roland and MERS stipulated, and the court ordered, that Roland and Restoreloution, and any entities under their control, would not impersonate or use the name MERS "or any confusingly similar designations" on any document; sign, execute, or prepare any documents on MERS's behalf; or record any documents purportedly executed by or on behalf of MERS.

Prior to trial, the prosecutor sought to admit the stipulated judgment as evidence of Roland's knowledge and intent.  The prosecutor argued the stipulated judgment was admissible as a party admission under Evidence Code section 1220 and as other act evidence under Evidence Code section 1101, subdivision (b).  Roland objected to the evidence contending it should be excluded under Evidence Code sections 1153.5 and 1154.  The trial court ruled that Evidence Code section 1154 was not applicable but did not

42

expressly address Evidence Code section 1153.5.  The trial court allowed the evidence to be admitted both as an admission and under Evidence Code section 1101, subdivision (b) as evidence relevant to Roland's knowledge regarding whether he was authorized to sign the documents.

At trial, both the complaint and the stipulated judgment were admitted as evidence without further objection from Roland.[16]

Roland now contends the stipulated judgment should have been excluded under Evidence Code section 1153.5.[17]  The Attorney General contends the evidence was properly admitted under Evidence Code sections 1220 and 1101, subdivision (b).

B.  *Analysis*

We agree with the Attorney General that the evidence was properly admitted under Evidence Code section 1220, which states, "Evidence of a statement is not made inadmissible by the hearsay rule when offered against

---

[16]    The trial court admitted into evidence both the complaint and the stipulated judgment.  Defense counsel did not object to the prosecutor asking the MERS representative about the contents of the complaint, except for its reference to Roland's prior conviction.  After defense counsel established on cross-examination that none of the MERS-related documents were filed after the stipulated judgment, on redirect, without objection, the prosecutor showed the witness the complaint to establish the lawsuit was pending at the time the MERS-related documents were signed.  Defense counsel did not object to admission of the complaint, and Roland does not contend on appeal that admission of the complaint was erroneous.

[17]    Roland further contends that, if his claim was forfeited by counsel's failure to renew the evidentiary objection, then counsel provided ineffective assistance.  The Attorney General does not contend the claim was forfeited. We conclude that Roland's arguments in opposition to the prosecutor's motion in limine were adequate to preserve this claim.  (Evid. Code, § 353, subd. (a); see *People v. Morris* (1991) 53 Cal.3d 152, 189, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity."  "Although Evidence Code section 1220's exception to the hearsay rule is sometimes referred to as an exception for admissions, the exception is not so limited.  [Citation]  Instead, the exception applies to all statements of the party against whom they are offered." (*People v. Rodriguez* (2014) 58 Cal.4th 587, 637 [defendant's statements made at deposition admissible under Evid. Code, § 1220].)  The exception extends to a party's prior stipulation in civil and criminal proceedings.  (See *Borror v. Department of Investment* (1971) 15 Cal.App.3d 531, 544-546 [complaint in civil action charging licensees with fraud, and stipulation in which licensees stipulated that the allegations in the complaint were true, were admissible under Evid. Code, § 1220]; *Salazar v. Upland Police Dept.* (2004) 116 Cal.App.4th 934, 946-947 [stipulation filed in plaintiff's criminal case was admissible in civil case pursuant to Evid. Code, § 1220].)

The stipulation was also admissible under Evidence Code section 1101, subdivision (b), to show that Roland knew the documents he caused to be signed were unauthorized and illegitimate.  (*Erskine*, *supra*, 7 Cal.5th at p. 295 [" ' "[O]ther crimes" evidence is admissible under Evidence Code section 1101, subdivision (b) "when offered as evidence of a defendant's motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident in the charged crimes." ' "].)  The evidence was highly probative to refute Roland's defense that he believed his actions were lawful.  Because Roland fails to address this issue on appeal, he has waived any claim that the evidence was not properly admitted under Evidence Code section 1101, subdivision (b).

Roland's reliance of Evidence Code section 1153.5 is misplaced. That section provides that "[e]vidence of an offer for civil resolution of a criminal matter pursuant to the provisions of Section 33 of the Code of Civil Procedure, or admissions made in the course of or negotiations for the offer shall not be admissible in any action." Code of Civil Procedure section 33 provides that "[a] prosecuting attorney, in his or her discretion, may assist in the civil resolution of a violation of an offense described in Title 13 (commencing with Section 450) of Part 1 of the Penal Code [Crimes Against Property] in lieu of filing a criminal complaint." Here, the stipulated judgment resolved a civil lawsuit filed by MERS against Roland. By its plain language, Evidence Code section 1153.5 applies exclusively to an offer for civil resolution *of a criminal matter*, *assisted by a prosecuting attorney*. Roland cites no case law applying Evidence Code section 1153.5 in any context, much less any cases suggesting the statute applies to the facts of this case. Roland has not demonstrated the statute is applicable here, and we thus conclude the evidence was properly admitted.

Even assuming the evidence was admitted in error, any assumed error was harmless. (See *Felix*, *supra*, 41 Cal.App.5th at p. 187.) As discussed *ante*, the evidence supporting Roland's grand theft convictions was overwhelming, as was the evidence supporting the convictions for filing a false instrument. The jury reasonably rejected Roland's claim that he believed he could extinguish lenders' liens if they failed to respond within 20 days of notices of rescission and offers to return property. Contrary to his assertion that he was helping people who were vulnerable, he developed a scheme using fraudulent signatories and false notaries to purport to transfer title without authority from the lenders. In light of the overwhelming

45

evidence against Roland, any assumed error in admitting the evidence was harmless.

## IV.

### *Applicability of Section 12022.6 Enhancement*

The jury found true the allegation that in the commission of his crimes, the aggregate losses to the victims from all the charges arise from a common scheme and plan and exceed $200,000.  (§ 12022.6, subds. (a)(2), (b).)  The trial court imposed a consecutive two-year term in connection with this enhancement.  (§ 12022.6, subds. (a)(2), (b).)  Roland contends the two-year enhancement must be stricken because the statute was repealed after he committed the offenses.

During the time period when Roland committed the offenses, section 12022.6, subdivision (a)(2) provided, "When any person takes, damages, or destroys any property in the commission or attempted commission of a felony, with the intent to cause that taking, damage, or destruction, the court shall impose an additional term as follows:  [¶] . . . [¶]  (2) If the loss exceeds two hundred thousand dollars ($200,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of two years."  Subdivision (b) further provided, "the additional terms provided in this section may be imposed if the aggregate losses to the victims from all felonies exceed the amounts specified in this section and arise from a common scheme or plan."  (Former § 12022.6, subd. (b).)

Subdivision (f) of former section 12022.6 contained a sunset clause, which stated:  "It is the intent of the Legislature that the provisions of this section be reviewed within 10 years to consider the effects of inflation on the

46

additional terms imposed.  For that reason this section shall remain in effect only until January 1, 2018, and as of that date is repealed unless a later enacted statute, which is enacted before January 1, 2018, deletes or extends that date." (See Stats. 2010, ch. 711, § 5.)  The Legislature did not enact a new statute or extend the existing statute.  (See *People v. Abrahamian* (2020) 45 Cal.App.5th 314, 336, fn. 8 (*Abrahamian*).)  Thus, pursuant to the sunset clause, the statute was repealed effective January 1, 2018.  (*Ibid.*)

A statutory amendment imposing lighter punishment generally operates retroactively (*In re Estrada* (1965) 63 Cal.2d 740, 748), and in the absence of a savings clause, the repeal of a criminal statute prevents charging a person with a statutory crime (*People v. Rossi* (1976) 18 Cal.3d 295, 304).  However, the *Estrada* rule does not apply to a statute which expires under its own terms (i.e., through a sunset clause).  (*In re Pedro T.* (1994) 8 Cal.4th 1041, 1045-1050.)  "Ordinarily when an amendment lessens the punishment for a crime, one may reasonably infer the Legislature has determined imposition of a lesser punishment on offenders thereafter will sufficiently serve the public interest.  In the case of a 'sunset' provision attached to a temporary enhancement of penalty, the same inference cannot so readily be drawn." (*Id.* at p. 1045.)  Rather, "the very nature of a sunset clause, as an experiment in enhanced penalties, establishes—in the absence of evidence of a contrary legislative purpose—a legislative intent the enhanced punishment apply to offenses committed throughout its effective period." (*Id.* at p. 1049.)

Applying the reasoning of *Pedro T.*, we conclude the trial court properly imposed an enhancement to Roland's sentence pursuant to former section 12022.6.  The Legislature's adoption of a sunset clause reflects an intent that the enhancement at issue here applies to crimes, such as

Roland's, committed prior to January 1, 2018.  Two recent cases, with which
we agree, reach the same conclusion.  (See *Abrahamian*, *supra*,
45 Cal.App.5th at pp. 337-338 [rejecting defendant's claim that the trial court
erred in imposing a two-year consecutive term for the section 12022.6
enhancement because the statute was repealed before she was sentenced];
*People v. Medeiros* (2020) 46 Cal.App.5th 1142, 1150-1154, 1157 (*Medeiros*)
[analyzing the statutory language and legislative history of section 12022.6
and concluding the enhancement was applicable to offenses committed
throughout its effective period].)[18]

V.

*Mandatory Fine Under Section 186.11, Subdivision (c)*

The Attorney General contends the case must be remanded to allow
the trial court to determine and impose a fine under section 186.11,
subdivision (c) which the Attorney General contends is a mandatory fine.[19]
Roland concedes that if the statute is indeed mandatory, then remand is
appropriate.  We agree the fine is mandatory and remand is appropriate.

_____

[18]    Roland relies on *People v. Nasalga* (1996) 12 Cal.4th 784, but that case
"did not address the retroactive or prospective effect of the statute's sunset
clause and, accordingly, it is of no assistance" to Roland.  (*Medeiros*, *supra*,
46 Cal.App.5th at p. 1157.)

[19]    Section 186.11, subdivision (c) states, "Any person convicted of two or
more felonies, as specified in subdivision (a), shall also be liable for a fine not
to exceed five hundred thousand dollars ($500,000) or double the value of the
taking, whichever is greater, if the existence of facts that would make the
person subject to the aggravated white collar crime enhancement have been
admitted or found to be true by the trier of fact.  However, if the pattern of
related felony conduct involves the taking of more than one hundred
thousand dollars ($100,000), but not more than five hundred thousand
dollars ($500,000), the fine shall not exceed one hundred thousand dollars
($100,000) or double the value of the taking, whichever is greater."

"Section 186.11, subdivision (c) requires imposition of a specified fine, if the defendant is 'convicted of two or more felonies, as specified in subdivision (a),' and the jury finds true the section 186.11, subdivision (a) allegation." (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1251, fn. omitted; accord *People v. Denman* (2013) 218 Cal.App.4th 800, 816.)  Here, the jury found the enhancement under section 186.11, subdivision (a)(2) to be true.  As such, the imposition of a fine was mandatory, and the failure of the trial court to impose the fine constitutes an unauthorized sentence. (*Denman*, at p. 816.) The proper recourse is to remand the matter to allow the trial court to determine and impose the appropriate fine pursuant to section 186.11, subdivision (c). (*Denman*, at pp. 816-817.)

<h2 style="text-align:center">DISPOSITION</h2>

The judgment is reversed in part, and the matter is remanded for the trial court to determine and impose the mandatory fine pursuant to Penal Code section 186.11, subdivision (c).  In all other respects, the judgment is affirmed.

GUERRERO, J.

WE CONCUR:

AARON, Acting P. J.

DATO, J.

KEVIN J. LANE, Clerk of the Court of Appeal, Fourth Appellate District, State of California, does hereby Certify that the preceding is a true and correct copy of the Original of this document/order/opinion filed in this Court, as shown by the records of my office.

WITNESS, my hand and the Seal of this Court.

09/11/2020

KEVIN J. LANE, CLERK

By _____
Deputy Clerk

49